UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| DAVID L. BEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:04-CV-294 |
| | ) | (SHIRLEY) |
| LOWE'S HOME CENTERS, INC., | ) | |
| d/b/a LOWE'S HOME IMPROVEMENT | ) | |
| WAREHOUSE STORE OF KNOXVILLE, | ) | |
| STORE NO. 0637, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This civil action is before the Court pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 22] on the defendant's Third Motion In Limine Re: Exclusion of Expert Testimony [Doc. 42] and Motion for Summary Judgment. [Doc. 43] On May 12, 2008, the parties appeared before the Court for a hearing on the instant motions. After the hearing, the Court took the matter under advisement, and the motions are now ripe for adjudication. The Court will address each of the motions in turn.

**I.      Brief Summary of Relevant Facts**

On June 14, 2003, plaintiff David Best ("Plaintiff") was shopping for pool chemicals at the Lowe's Home Improvement Warehouse ("Defendant") located at 6600 Clinton Highway in Knoxville, Tennessee. [Doc. 1] While at the Defendant store, Plaintiff reached for a container of pool chemicals, described in the complaint as BPL 5040, manufactured by Buckman Laboratories. [Id.] The product at issue was latter described as Aqua EZ Super Clear Clarifier. ("Aqua EZ") [Doc. 36] While retrieving the container of Aqua EZ, the contents of the container splashed out,

striking Plaintiff in the face, shirt, and leg. [Doc. 1] After being struck, Plaintiff noticed that the container he had retrieved had been cut open. [Id.] Defendant alleges that, because of the incident, he has suffered injuries, including permanent anosmia (a loss of the sense of smell).

## II.     Exclusion of Dr. Moreno

The defendant moves the Court to exclude the testimony of the plaintiff's medical expert, Dr. Francisco Moreno ("Dr. Moreno"), arguing that Dr. Moreno's opinions do not satisfy the dictates of Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and thus should be excluded. Specifically, the defendant contends that Dr. Moreno's opinions are unreliable and lack a reasonable basis in fact. The plaintiff disagrees, arguing that Dr. Moreno's opinions satisfy Daubert and are admissible.

### A.     Applicable Law: Admissibility of Expert Testimony

Defendant's motion challenges the admissibility of Dr. Moreno's testimony under Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The trial judge must act as a gatekeeper, admitting only that expert testimony that is relevant and reliable. Daubert, 509 U.S. at 589. With regard to scientific knowledge, the trial court must initially determine whether the reasoning or methodology used is scientifically valid and

is properly applied to the facts at issue in the trial. Id. To aid the trial court in this gatekeeping role, the Supreme Court has listed several key considerations: (1) whether the scientific knowledge can or has been tested; (2) whether the given theory or technique has been published or been the subject of peer review; (3) whether a known error rate exists; and (4) whether the theory enjoys general acceptance in the particular field. Id. at 592-94. The Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595. "[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir. 1995).

Although Daubert centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999); Berry v. City of Detroit, 25 F.3d 1342, 1350 (6th Cir. 1994). The trial court's objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152. The trial judge enjoys broad discretion in determining whether the factors listed in Daubert reasonably measure reliability in a given case. Id. at 153. The party proffering the expert testimony bears the burden of showing its admissibility under Rule 702 by a preponderance of the evidence. Daubert, 509 U.S. at 592 n. 10. With this framework in mind, the Court will now address Defendant's motion.

B.  Dr. Moreno's Deposition Testimony

Dr. Moreno did not appear for the May 14, 2008, hearing, with the parties instead arguing the matter based upon the previous deposition of Dr. Moreno.[1]  Having reviewed the deposition testimony, the Court finds the following segments helpful in resolving the question of whether Dr. Moreno's expert testimony is admissible.  In the interests of judicial economy, the Court will summarize portions of the testimony, rather than quoting the entirety of each section.

In pages nine through twelve of his deposition, Dr. Moreno testified that he did not review any of Plaintiff's hospital records following Plaintiff's alleged exposure at the Defendant store and stated "I didn't really particularly see a need for it.  The patient complained of an exposure to a chemical and becoming anosmic after that." [Dep. at p. 9] Dr. Moreno went on to confirm that his opinions were based on an exposure by way of inhalation and agreed that it would be important to know whether Plaintiff actually reported an inhalation exposure at that hospital on the day of the accident. [Id. at pp. 9-10] However, Dr. Moreno also claimed that, while it would be important, "it wouldn't be the only. . . it wouldn't be the only cue to his problem." [Id. at p. 9] He also stated that if Plaintiff had denied inhaling the product while at the emergency room on June 14, 2003, "that would be relatively important, but the denial of inhalation does not necessarily constitute a total denial that he inhaled some of the product." [Id. at p. 10]. In explaining that response, Dr. Moreno

---

[1]The deposition of Dr. Moreno, taken April 22, 2008, has been filed as [Doc. 42-2]. The Court will cite to specific pages of the deposition in the following format: [Dep. at p. ].

stated "the fact that, as I understand. . . I haven't reviewed the records, so I can't really say. Until I review those, I can't really expound anymore." [Id.]

After being shown the records from Plaintiff's emergency room visit, which allegedly indicate that Plaintiff denied any inhalation of the chemicals, Dr. Moreno was again asked if that type of information would have been important to him in his capacity as an expert testifying with regard to a relationship between an alleged inhalation and his diagnosis. [Id. at p. 11] Dr. Moreno responded that "I believe he had an exposure to a chemical. As I understand, it was spilled on him. I believe that he inhaled some of the chemical. This is a note that was made, I assume, by the nurse. I don't really know. In times of. . . . sometimes in times of seeing a patient acutely in the emergency room some things may or may not be missed or misdirected." [Id.] When asked if he believed that the account in the emergency room record was incorrect, Dr. Moreno stated that he simply did not know. [Id.] When asked if the account in the emergency room record was correct, and when asked to assume that it was correct and that Plaintiff had denied inhaling the substance, and then asked if that would be detrimental to his opinion that Plaintiff inhaled something on June 14 causing his loss of smell, Dr. Moreno testified that:

> this is what you attorneys refer to as cause and affect. The patient was normal before the accident, he was smelling, didn't have any problems, he is exposed to chemical that we have since then identified, and he now can not smell. So, I would have to assume that regardless of the statements made that he had to have had some exposure.

[Id. at pp. 11-12]

5

In addition, when asked if he had formulated his own opinion that inhalation of the chemical in issue could cause the type of damage claimed by Plaintiff, Dr. Moreno testified that "what I formulated was a cause-and-effect-type relationship." [Id. at p. 19] When asked if Plaintiff's alleged injury was caused by the exposure to the chemical, Dr. Moreno testified affirmatively. [Id.] However, when asked how much of the chemical Plaintiff was exposed to, Dr. Moreno stated that he had no idea. [Id.]

A key portion of Dr. Moreno's testimony on this issue occurred as follows: after being asked if propenyl chloride (one of the chemicals in issue) was able to cause a loss of sense of smell through inhalation, and after testifying that according to the MSDS sheets, it is a respiratory irritant, which can irritate the mucosa, and after testifying that he did not know how much was necessary to cause that type of irritation or damage, and further did not know how much Plaintiff was exposed to, the following colloquy occurred:

> Q - How can you say that this chemical caused his loss of sense of smell?
>
> A - It's a cause and effect.
>
> Q - I don't understand what you mean?
>
> A - I mean, the patient had an accident, he was exposed to a chemical and he has lost his sense of smell. If we are to assume that. . . you know, I believe the patient, my patient's statement that. . .
>
> Q - So is really all your going off is the history that was given to you that he had an exposure and now he can't smell?

>               A - Yes, sir.

[Id. at p. 26-27]

The following colloquy further establishes the "temporal proximity" position taken by Dr. Moreno:

> Q - Since you don't know what level of exposure is necessary to cause loss of sense of smell, you can't say that this Aqua EZ Super Clear Clarifier caused the loss of sense of smell, can you?
>
> A - The patient was exposed to it and he lost his smell. All I can say is that, you know, if you are exposed to something and all of a sudden something happens, then there has to be a. . . causative factor.

[Id. at p. 28]

In the following questioning, when asked if all he had done in this case was take a history from Plaintiff, review the MSDS sheets, and try to call the manufacturer of the chemical at issue, Dr. Moreno answered affirmatively. [Id. at p. 29] When asked if he had reviewed any documents which discussed propenyl chloride actually causing a loss of sense of smell or reviewing any documents that such an ammonia derivative could cause a loss of sense of smell, Dr. Moreno stated that he did not have any information on either of those. [Id.]

When asked if his testimony was based on speculation of things that could cause this injury, Dr. Moreno testified that:

> the patient had an accident, a chemical was spilled, the patient can not smell. If we have any trust in the patient at all, all I can say is that he can not smell. I did test him, his test was positive in the fact that he was anosmic. And all I can tell you is that

exposure to the. . . the only exposure that he had at the time that I talked to him was exposure to this chemical, there was nothing else in his history that dictated the fact that he was anosmic otherwise.

[Id. at pp. 32-33]

Additionally, the Court notes that Dr. Moreno conceded the following as things that he did not know:

> 1. Whether Plaintiff reported while at the emergency room on the day of the accident that he had actually inhaled the product in issue. [Id. at pp. 9-11].
>
> 2. Whether Plaintiff's history was of an immediate/instant loss of smell after the exposure. [Id. at pp. 14-15]
>
> 3. Whether the chemicals identified could cause a loss of smell immediately or whether they could cause a loss of smell over time. [Id. at pp. 15, 38-39]
>
> 4. The actual amount of chemical (i.e. dosage) to which Plaintiff was exposed [Id. at p. 19]; the amount of chemical spilled [Id. at p. 20]; the time frame or length of Plaintiff's exposure to the chemical. [Id. at p. 20]
>
> 5. What amount of inhalation, of the chemicals at issue, is necessary to cause anosmia. [Id. at p. 20]
>
> 6. The existence of any data or medical information regarding amounts of exposure, to the chemicals in issue, necessary to cause anosmia, and his calls to CIBA were for the purpose inquiring about the same and past exposures to the chemicals and anosmia. [Id. at pp. 22-23]
>
> 7. The amount (percentage or otherwise) of either propenyl chloride, or ammonium derivative, present in the Aqua EZ product. [Id. at p. 25]

8

8. The amount of exposure to either propenyl chloride or the ammonium derivative necessary to cause a loss of smell. [Id. at p. 25]

9. Of any published reports or exposure data regarding these chemicals known in humans. [Id. at p. 25]

10. Of any documents or medical literature regarding propenyl chloride causing a loss of sense of smell and contends none are available, and that the same is true with regard to the ammonium derivative. [Id. at p. 29]

11. What, other than propenyl chloride and the ammonium derivative, was in the product, nor did he know if these chemicals, when combined with other materials, would retain any level of toxicity. [Id. at p. 35] Dr. Moreno did indicate such information would be important to know. [Id. at p. 37]

12. To what extent the Plaintiff was exposed to the chemical, but indicated that information would be informative. [Id. at pp. 40-41]

13. Whether exposure to any chloride or ammonium derivative can cause an actual loss of smell, but Dr. Moreno did testify that would probably be determined by the concentration and time factors, neither of which he knew. [Id. at p. 58]

Even in regard to his testimony regarding the potential of irritation or damage to the nasal mucosa, rather than loss of smell, the following colloquy is informative:

> Q - And then it's your opinion that this Aqua EZ Super Clear Clarifier, if inhaled, has the potential to cause damage to nasal and sinus mucosa, right?
>
> A - Yes, sir.
>
> Q - And I guess you say potential because it is dependent on the amount of the exposure and the length of the exposure, right?
>
> A - Yes, sir.

> Q - And both of those things you don't know in this case?
>
> A - No, sir.

[Id. at p. 45]

### C. Analysis

In determining the admissibility of Dr. Moreno's testimony the Court finds the case of Downs v. Perstorp Components, Inc., 126 F. Supp. 2d 1090 (E.D. Tenn. 1999), instructive. Downs also addressed the admissibility of the expert testimony of a medical doctor, Dr. Kilburn, as to whether a chemical compound, Rubiflex, was dangerous. The Downs Court noted the following:

> In essence, Dr. Kilburn's expert opinion relating to causation rests upon: (1) Rubiflex is a chemical compound; (2) plaintiff was exposed to Rubiflex on October 10, 1995; (3) plaintiff experienced a reaction to his exposure for which he was treated by his family physician; and (4) Dr. Kilburn's examination and testing of plaintiff. Dr. Kilburn has no idea of the dose of the chemical received by plaintiff, and he has no idea if the dose was of sufficient magnitude to cause a medical condition.

Id. at 1125. The Downs Court then proceeded to note that:

> A recent treatise commenting upon the admission of expert testimony following the Supreme Court's decision in Daubert indicates that there are seven "red flags" which should cause concern for the trial court, as gatekeeper, in admitting expert scientific (and now technical) testimony. None of these factors is dispositive, the treatise stipulates, but each has been considered as cutting against admissibility.
>
> 1. Improper extrapolation. That is, leaping from an accepted scientific premise to an unsupported conclusion. An example of improper extrapolation is an expert's use of structure analysis where there is no demonstrated connection between a certain chemical substance and a certain injury, but there is a demonstrated connection between a similar chemical substance and that injury. For example, there is no scientifically demonstrable connection between Bendectin and birth defects; but there is scientific evidence that substances with a chemical structure similar to that of Bendectin causes birth defects.

Thus, the expert employing structure analysis reasons that substances with similar chemical structures cause similar injuries. But this reasoning is not consistent with the scientific method because even minor changes in molecular structure can alter a substance's effect. The metabolic process stands as an unknown intervening variable between the original chemical structure and the adverse effect. Joseph Sanders, Scientific Validity, Admissibility and Mass Torts After Daubert, 78 Minn. L. Rev. 1387, 1409 (1994). Similarly, it is improper extrapolation to conclude, without any supporting research, that a substance that causes one harm also causes a different harm. See, Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594 (9th Cir. 1996); Schudel v. General Electric Co., 120 F.3d 991 (9th Cir. 1997); Cavallo v. Star Enter., 892 F. Supp. 756 (E.D. Va. 1995) aff'd in pertinent part, 100 F.3d 1150 (4th Cir. 1996).

2. Reliance on anecdotal evidence. That is, basing an expert opinion upon the expert's own experience or on a few case studies. For example, in Cavallo v. Star Enter., 892 F. Supp. 756 (E.D. Va. 1995), aff'd in pertinent part, 100 F.3d 1150 (4th Cir. 1996), the plaintiff alleged that she suffered respiratory illness as a result of exposure to aviation jet fuel vapors that were released from overflow at the defendant's storage terminal. Plaintiff's expert toxicologist relied on case studies in which people who were exposed to the organic compounds in jet fuel suffered respiratory illnesses, although most of the illnesses were temporary. The court prohibited plaintiff's expert from offering testimony because reliance on these studies to form a conclusion was inconsistent with the scientific method. The court ruled that "case reports are not reliable scientific evidence of causation, because they simply describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation." Importantly, the treatise reflects, the court noted that the toxicologist did not purport to follow the methodology ordinarily followed by toxicologists. Rather, he formed his opinion "and then tried to conform it to the methodology." See also, Casey v. Ohio Med. Prods., 877 F. Supp. 1380 (N.D. Cal. 1995).

3. Reliance on temporal proximity. That is, relying too heavily upon an individual's prior good health and the temporal proximity between the ingestion of a substance and the development of a subsequent illness. Forming a conclusion on the basis of temporal proximity, in the absence of some established scientific connection between substance and illness, is inconsistent with the scientific method

because the expert fails to consider other possible explanations -- not to mention the unexplainable -- that a scientist would want to look into before drawing a conclusion.

4. Insufficient information about the case. That is, relying upon proper methodology but failing to connect it with the facts of the case. This is similar to the "fit" requirement of Daubert, wherein the Supreme Court stated that a scientific principle may be valid for one purpose but not for another. The principle, though valid, might not "fit" the facts of the case at bar. For example, in Chikovsky v. Ortho Pharmaceutical Corp., 832 F. Supp. 341 (S.D. Fla. 1993), the court granted summary judgment after holding inadmissible plaintiff's expert testimony that Retin-A caused the plaintiff's birth defects. Plaintiff's mother had used Retin-A topically for skin blemishes during her pregnancy. Some studies tended to show a connection between a product similar to Retin-A and birth defects, but only when the product was taken orally and in large doses. Plaintiff's expert did not know how much Retin-A plaintiff had applied to her skin during pregnancy, however, and it was clear that the amount could not have approached the dosages in the studies relied upon by the expert. See also, Bogosian v. Mercedes-Benz of North America, Inc., 104 F.3d 472 (1st Cir 1997); Sorensen v. Shaklee Corp., 31 F.3d 638 (8th Cir. 1994).

5. Failure to consider other possible causes. That is, reaching a conclusion before the expert makes a reasonable attempt to eliminate some of the most obvious causes. In medical terms, this is called conducting a differential diagnosis, e.g., excluding other causes, such as genetics or other toxins, for a certain disease. In epidemiological terms, this is also controlling for confounding factors. For example, in Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994), plaintiffs brought an action under FELA alleging that they were injured by exposure to toxic chemicals. Plaintiff's experts had concluded that plaintiff's injuries were caused by exposure to toxic chemicals, but they neglected to investigate any other possible causes of the plaintiff's injuries. The Ninth Circuit Court of Appeals held that, "coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method. Certainly, scientists may form an initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method." Claar v. Burlington N.R.R., supra. See also,

> In re: Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3rd Cir. 1994).
>
> 6. Lack of Testing. That is, failing to test the hypothesis the expert relies upon. As pointed out by the treatise, if the expert has not even tested the hypothesis he is testifying to, this is considered an extremely negative factor. Although the problem ordinarily arises in product liability cases where the plaintiff calls an expert to testify about an alternate design, the treatise points out that it also has applicability to expert testimony in general. While testing should not be an absolute requirement to the admissibility of expert testimony on design safety, the treatise states, it should be supported by some testing, tests conducted by others, or by relevant literature. See, e.g., Cummins v. Lyle Indus., 93 F.3d 362 (7th Cir. 1996); Tassin v. Sears, Roebuck & Co., 946 F. Supp. 1241 (M.D. La. 1996).
>
> 7. Subjectivity. That is, the scientific method must be an objective one. This is the essence of what the Supreme Court referred to as scientific validity, also known as "falsifiability." It follows that if an expert's methodology cannot be explained in objective terms, and is not subject to be proven incorrect by objective standards, then the methodology is presumptively unreliable. For example, in O'Conner v. Commonwealth Edison Co., 13 F.3d 1090 (7th Cir.) cert. denied, 512 U.S. 1222, 129 L. Ed. 2d 838, 114 S. Ct. 2711 (1994), plaintiff claimed that her cataracts were caused by exposure to nuclear radiation. Plaintiff called an ophthalmologist who testified to that effect and who based his conclusion on a visual inspection of the plaintiff's eyes. The expert testified that he could identify radiation-induced cataracts by simple visual observation. There was no scientific support for this premise, however, and defendant's experts demonstrated that a proper methodology for detecting radiation-induced cataracts included a medical work-up, a work-up of the patient's history, and an examination of occupation dosimetry charts. The court ruled that the testimony failed under Daubert because the expert employed a completely subjective approach that was rejected by other scientists, and which could not be proved false.

Downs, 126 F. Supp. 2d at 1125-28 (quoting 2 Saltzburg, Martin & Kapra, Federal Rules of Evidence Manual, 1229-37 (7th Ed. 1998)). After analyzing these seven "red flags," the Downs Court found that the expert testimony at issue had raised each of the flags and ruled that the testimony was not admissible, in part because the expert's opinion was "essentially based upon his

13

determination, without any scientific basis, that all injuries which occur after exposure to a chemical compound must be causally related to and result from the individual's exposure to chemicals." Downs, 126 F. Supp. 2d at 1128.

In the instant case, the Court finds that the plaintiff's expert has raised all but one of the same "red flags." With respect to the first flag, that of improper extrapolation, Dr. Moreno had no evidence that the chemicals at issue could even cause the type of injury of which Plaintiff complained of. Yet the doctor's opinion extrapolates that, because Aqua EZ can be irritating to mucus mebranes [Dep. at p. 21], it follows that Aqua EZ caused Plaintiff's anosmia, even though there is no evidence that Aqua EZ, or its chemical components, causes, or can cause, anosmia.

Doctor Moreno's opinion also raises the second flag, that of reliance on anecdotal evidence, because the doctor relies in part on his past, general experiences with patients, rather than on direct experience with the chemical in question, or with regard to any medically correlated specifics with those prior patients.

With respect to the third flag, reliance on temporal proximity, Dr. Moreno testified repeatedly that his opinion was essentially based on "cause and effect," that Plaintiff was exposed to the chemical and then lost his sense of smell. Thus the doctor clearly bases his opinion in large part on the temporal proximity between the incident and the reported injury.

With respect to the fourth flag, insufficient information about the case, it is clear from the record that Dr. Moreno did little or no investigation into this matter, and had very little knowledge about the facts of the case, instead relying on Plaintiff's general and subjective report of the accident, an examination of Plaintiff, and the MSDS sheet.

Dr. Moreno's testimony also raises the fifth flag, that of failure to consider other possible causes, because the doctor testified that he did not know what Lescol, one of Plaintiff's prescription drugs, was or what side effects it could have. [Dep. at pp. 13-14]

With respect to the sixth flag, lack of testing, Dr. Moreno did test Plaintiff to determine whether Plaintiff had actually lost his sense of smell, but there has been no causation testing to determine whether Aqua EZ can cause the type of injury at issue. Dr. Moreno testified that human testing is not appropriate in this type of case, so while the Court does not hold the lack of actual testing against the admissibility of the doctor's testimony in this instance, neither does it weigh in favor of admissibility.

Finally, with respect to the seventh flag, subjectivity, Dr. Moreno's testimony also raises that flag. In the instant case, Dr. Moreno did not rely on the scientific method to determine that Plaintiff's injury was caused by Aqua EZ, but instead relied solely on temporal proximity and cause and effect. The doctor did not use his scientific training and knowledge to attempt to simulate what sort of injury the chemicals at issue caused, nor did the doctor even analyze the chemicals at issue, instead just reading the MSDS sheet provided to him. Dr. Moreno's approach was completely subjective, and thus inadmissible. In its simplest terms, Dr. Moreno's testimony was little different from a lay person's "opinion" that Plaintiff came in contact with a chemical and later experienced a loss of smell, so the two "must be" causally related to each other as the "cause" and the "effect."

Dr. Moreno's testimony also runs afoul of <u>Daubert</u> for other reasons, as well. The doctor's theories are not based upon sound scientific principles, his theory has not been tested by the scientific community, has not been subjected to peer review, the potential rate of error has not been determined, and there is no evidence that Dr. Moreno's belief that Aqua EZ can cause the type of

15

injury at issue has been accepted by the scientific community. As the Downs Court noted, "under the regime of Daubert a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." Downs, 126 F. Supp. 2d at 1128 (citation omitted). In the instant case, the Court finds that Dr. Moreno's opinion is the latter, unscientific speculation, and must be excluded. Accordingly, Defendant's motion to exclude [Doc. 42] is hereby **GRANTED** to the extent that Dr. Moreno's expert opinions and testimony regarding causation of Plaintiff's loss of smell/anosmia will be excluded in this matter.

### III.     Summary Judgment

Defendant also moves the Court to grant it summary judgment in this case, arguing that without Dr. Moreno's opinion, Plaintiff cannot show causation. Under Sixth Circuit and Tennessee law, "[e]vidence which presents no more than a choice of probabilities is not deemed substantial enough to warrant the submission of a case to the jury. Liability cannot be predicated upon mere conjecture or speculation as to the proximate cause of damage." Dayton Veneer & Lumber Mills v. Cincinnati, N. O. & T. P. R. Co., 132 F.2d 222, 223 (6th Cir. 1942) (citations omitted). In the instant case, the Court has excluded Dr. Moreno's expert testimony as to causation relating to Plaintiff's alleged anosmia, and in the absence of Dr. Moreno's opinion, Plaintiff has no evidence that proves that Plaintiff's exposure to Aqua EZ caused Plaintiff's injury of anosmia/loss of sense of smell. Furthermore, as Dr. Moreno's testimony established, other possible causes of the injury, such as a reaction to a prescribed drug, some other exposure, or an ideopathic cause, have not been ruled out. Thus, the only proof Plaintiff has to offer is mere speculation that Aqua EZ caused the loss of smell/anosmia injury. Without some admissible (and likely expert) proof as to causation,

Defendant's motion must be granted as to Plaintiff's claim of loss of smell/anosmia. Accordingly, Defendant's motion for summary judgment [Doc. 43] is hereby **GRANTED** to that extent only as a partial summary judgment. However, because Plaintiff, if he can establish liability on part of Defendant, may still be able to prove other injuries, expenses, economic loss, or other damages (even if relatively minor) as a result of this incident, the Court cannot grant summary judgment as to the entire complaint. Accordingly, this Order grants a partial summary judgment only as to the issue of Plaintiff's claim for injury for his alleged loss of smell/anosmia.

In so ruling, the Court recognizes that Defendant's motion for summary judgment was untimely, as such a motion was due 120 days before trial. [Doc. 25] However, given the late supplementation of Dr. Moreno's expert report, as Ordered [Doc. 41] by the Court on April 18, 2008, the Court finds that the late filed motion for summary judgment was permissible.

**IV. Summary**

For the reasons set forth more fully above, Defendant's motion to exclude the expert testimony of Dr. Moreno [Doc. 42] is **GRANTED** to the extent set forth above, and Defendant's motion for summary judgment [Doc. 43] is hereby **GRANTED in part** to the extent set forth above.

**IT IS SO ORDERED.**

                                                  **ENTER:**

                                                    s/ C. Clifford Shirley, Jr.
                                                 United States Magistrate Judge